**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **PEARL SEAS CRUISES, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **C.A. NO. 4:13-cv-02790** |
| | § | |
| **LLOYD'S REGISTER NORTH** | § | **Jury Trial Demanded** |
| **AMERICA, INC.,** | § | |
| | § | |
| **Defendants.** | § | |

## FIRST AMENDED COMPLAINT

Plaintiff, PEARL SEAS CRUISES, LLC ("Pearl Seas"), by its attorneys Blank Rome LLP, for its complaint against Defendant LLOYD'S REGISTER NORTH AMERICA, INC. ("Lloyd's Register"), alleges upon information and belief as follows:

## PARTIES, JURISDICTION AND VENUE

1. At all relevant times, Pearl Seas was, and still is, a limited liability company existing under the laws of the Marshall Islands with a registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands, MH96960, and its principal place of business at 741 Boston Post Road, Guilford, Connecticut 06437.

2. The members of Pearl Seas include one resident of Connecticut, one resident of Florida, and three Connecticut trusts.

3.     Upon information and belief, Defendant Lloyd's Register was, and still is, a legal entity existing under the laws of Delaware, with its principal place of business located at 1330 Enclave Parkway, Suite 200, Houston, Texas, 77077. Service is requested on Lloyd's Register by and through its registered agent for service of process, Corporation Service Company d/b/a CSC Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

4.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332, in that it is a civil action between citizens of different States and the controversy exceeds seventy five thousand dollars, exclusive of interest and costs. This Court also has original admiralty and maritime jurisdiction under 28 U.S.C. § 1333.

5.     Defendant maintains an office in this judicial district and State, performs business in this State, and regularly advertises and markets its services in Texas.  Pearl Seas has satisfied all conditions precedent before filing this suit. Pearl Seas affirmatively pleads the discovery rule vis-à-vis limitations.  All claims are timely brought under the applicable limitations periods.  Lloyd's Register is equitably estopped from raising limitations as a defense.  Lloyd's Register also has waived all alleged limitations defenses through its intentional, fraudulent and reckless conduct, including perjury.

6.     Venue is proper pursuant to 28 U.S.C. § 1391(b).

## BACKGROUND FACTS

7.     Pearl Seas was formed as a limited liability company on April 25, 2006.  Its initial purpose was to build, operate and own three cruise ships.

8.     Lloyd's Register is a professional Classification Society and registered public surveyor.  Lloyd's Register is hired by ship owners to ensure compliance with The International Convention for the Safety of Life at Sea ("SOLAS") and other regulatory authorities, to provide various consultant services, and to "set safety and environmental standards for the design, construction and operation of ships" and ensure compliance with its own rules, which are updated continually "to reflect the newest industry, technology and statutory developments."  Lloyd's Register also acts as a Responsible Organization for certain vessel flag states, including the Marshall Islands, and, as such, is charged with ensuring that registered vessels comply with the laws and regulations of the flag state.  Lloyd's Register also works with port state agencies, including the United States Coast Guard ("USCG").

9.     Classification is the process by which a ship is inspected to make sure it complies with numerous safety regulations, and is a legal and practical requirement before a ship can operate and/or carry passengers internationally. Lloyd's Register is a registered Classification Society authorized and tasked to

conduct classifications based on its special knowledge, skill, training, professional licensing and experience. As a professional Classification Society, Lloyd's Register owes duties to: (a) promote the safety of life, property and the environment, (2) develop technical standards for the design and construction of vessels, (3) approve designs against professional standards, (4) conduct surveys and inspections with due care, (5) act as a Recognized Organization, and (6) ensure that vessels are constructed in accordance with Classification Society Rules as well as federal and international rules, regulations, statutes and treaties. A classification is a professional representation that a vessel is fit for its intended purpose and otherwise legally compliant.

10. SOLAS is an international convention originally adopted after the sinking of the Titanic to ensure the safety of life at sea. The International Maritime Organization has promulgated numerous regulations to implement SOLAS, including detailed provisions concerning the suppression of fire. Fire is a leading cause of death on cruise ships.

11. In or about August 2006, Charles A. Robertson of Pearl Seas began communicating with Graham Brown of Lloyd's Register about the vessels that Pearl Seas planned to operate. Several meetings occurred at Pearl Seas' offices in Guilford, CT. Over the course of several conversations, Lloyd's Register informed Pearl Seas that it wished to be the classification society for the three vessels Pearl

4

Seas planned to operate, and any future vessels as well.   Lloyd's Register explained that it would be to Pearl Seas' advantage to work with Lloyd's Register because as a new, small company, Pearl Seas could rely on Lloyd's Register to protect its interests as it went through the process of operating its vessels.

12.   Pearl Seas agreed to retain Lloyd's Register as the classification society for its vessels.

13.   On or about September 20, 2006, Pearl Seas and Irving Shipbuilding, Inc. ("Irving") entered into a shipbuilding contract (the "Contract").   Under the Contract, Irving agreed to build a passenger cruise ship to be purchased by Pearl Seas (the "Vessel").   The Contract required that, at the time of delivery, the Vessel was to (a) have all regulatory approvals needed for operation, and (b) be ready for immediate service.

14.   Irving was to build the Vessel in accordance with specifications set forth in the Contract, and in compliance with SOLAS, the rules and regulations of the Marshall Islands, Lloyd's Register's Rules and Regulations, and other applicable regulations and conventions.   The Vessel was to have all "documentation and national certification of the [V]essel for its intended service and route."

15.    Lloyd's Register also assumed responsibility for coordinating and ensuring compliance with the United States Coast Guard Initial Control Verification Exam ("ICVE").

16.    The Contract made clear that only valid class certificates establish compliance with rules of the classification society.   Contract § 8.3.1.4 states: "[Irving] shall deliver...all certificates including [Irving's] certification and classification certificates required to be furnished upon delivery of the Vessel pursuant to the Contract.   It is agreed that if, through no fault on the part of [Irving], the certificates are not available at the time of delivery of the Vessel, provisional certificates shall be accepted by [Pearl Seas] with final certificates as promptly as possible...."   This requirement is also in Specification 1320.2 of the Contract, which provides: "[Irving] shall obtain and deliver all required certificates and classification reports, etc, as required by either the flag state or the classification society."

17.    The Contract required Irving to obtain and pay for classification and to deliver the Vessel with classification certificates; coordinate all regulatory inspections; and "pay all fees for obtaining certificates, including associated fees of regulatory body inspectors."   Irving was to "obtain and deliver all required certificates and classification reports, etc., as required by either the flag state or the classification society posted on board, framed under glass."

6

18.     The Contract also contained an arbitration clause which provided for arbitration in New York in accordance with the Rules of the Society of Maritime Arbitrators, Inc., of any disputes between the parties with the exception of regulatory compliance.

19.     Pearl Seas asked Lloyd's Register to inspect and monitor the design and construction of its ships, including the Vessel.  It also asked Lloyd's Register to negotiate a price with Irving to perform regulatory services directly for Irving during the Vessel's construction, as Irving was required to deliver the Vessel in class and registered with the Marshall Islands.

20.     On or about October 17, 2006, Pearl Seas entered into a separate contract with Lloyd's Register (the "Plan Review Contract") whereby Lloyd's Register agreed to review and approve the plans for the construction of the Vessel. Lloyd's Register reviewed the plans for the Vessel and was paid $219,000 by Pearl Seas for doing so.

21.     Pearl Seas relied on Lloyd's Register's review and approval of the plans for the Vessel and Lloyd's Register's attendant representations.

22.     As stated above, during discussions that started in August 2006, Lloyd's Register's representatives told Pearl Seas on multiple occasions that it wished to be hired by Pearl Seas as the classification society for the company. Lloyd's Register issued a press release on January 9, 2007, announcing that it had

been so engaged.  As the construction of the Vessel proceeded, however, Irving

interfered and persuaded Lloyd's Register to take its side in disputes which arose

between Irving and Pearl Seas concerning the Vessel.   As discussed below,

Lloyd's  Register  made  fraudulent,  misleading  and  false  statements,  and

misrepresented the true condition of the Vessel, all to assist Irving in attempting to

force Pearl Seas to accept delivery of the Vessel and in support of Irving's position

in the arbitration proceeding with Pearl Seas.  Lloyd's Register actively assisted

Irving to help it achieve a favorable outcome in the arbitration.

23.    On or about December 8, 2006, Lloyd's Register entered into a

separate contract with Irving (the "Classification Contract"), whereby Lloyd's

Register agreed in writing to survey the Vessel during its construction to ensure

compliance with Marshall Islands laws and regulations, Lloyd's Register's Rules

and Regulations and, SOLAS, as required by the Contract.

24.    Among its duties under the Classification Contract, Lloyd's Register

was to confirm the Vessel's Fire Suppression System was fully in compliance with

SOLAS. Especially on a passenger cruise ship, the fire suppression system is of

vital importance in protecting the safety of passengers and the crew.

25.    After Lloyd's Register was appointed by Pearl Seas to be the Class

Society, the Marshall Islands also appointed Lloyd's Register as the "Recognized

Organization" to ensure the Vessel was constructed in accordance with the laws

8

and regulations of the Marshall Islands, including SOLAS.  Lloyd's Register began a dialogue with the USCG to ensure the Vessel would pass the Structural Fire Protection Exam and the Initial Control Versification Exam upon the Vessel's entry into the United States.

26.    In or about April 2008, Irving made its first demands for arbitration with Pearl Seas pursuant to the Contract to resolve a dispute concerning Pearl Seas' obligation to clarify the ship design, and in response to a notice of default sent to Irving by Pearl Seas.

27.    An arbitration panel was constituted and included Louis P. Sheinbaum, a maritime attorney appointed by Irving; David A. Nourse, a practicing maritime attorney appointed by Pearl Seas; and John M. Woods, a practicing maritime attorney who was selected as the Chairman by Mr. Sheinbaum and Mr. Nourse.

28.    The arbitration that followed between Pearl Seas and Irving was highly contentious.   The arbitration panel made no fewer than eleven partial final awards following submissions, oral arguments by the parties, and testimony by witnesses from each of the parties and third-party witnesses, including Lloyd's Register's employees.  There were numerous hearings over a period of more than 4 years, beginning in December 2008 and ending in December 2012.  The dispute between Pearl Seas and Irving was not resolved, and the arbitration not concluded,

until on or around April 10, 2013, nearly five years after it began, when the parties entered into a settlement agreement.

29.    Lloyd's Register continued to represent to Pearl Seas that the M/V PEARL MIST was class-worthy, SOLAS-compliant and in accordance with Lloyd's Register's technical standards, rules and regulations.

30.    At all material times, Pearl Seas relied on Lloyd's Register's representations to its detriment.  Because Lloyd's Register is a Classification Society, Pearl Seas relied on Lloyd's Register to provide accurate information about the condition of the Vessel.  Pearl Seas also relied on Lloyd's Register to comply with SOLAS and other governing laws and  to survey, inspect and classify the Vessel in accordance with Lloyd's Register's technical standards, rules and regulations.  Lloyd's Register, as a registered professional, was in the best position to survey the Vessel and note any material defects that would adversely affect its class-worthiness.

31.    The money that Pearl Seas had to pay Irving to resolve the arbitration proceeding represents damages that Pearl Seas incurred as a result of, and in reliance on, Lloyd's Register's classification survey of the Vessel and Lloyd's Register's continuing representations about the condition of the Vessel in general and its alleged class-worthiness and SOLAS-compliant condition in particular.

32.     As a result of its reliance on Lloyd's Register's representations and other assurances, Pearl Seas sustained significant monetary damages, including but not limited to, its loss of use of the Vessel, along with lost profits and lost revenues for a period of several years.  Pearl Seas also suffered very substantial arbitration costs and legal fees and expenses.

### LLOYD'S REGISTER COLLUDED WITH IRVING AND FALSELY REPRESENTED THE VESSEL'S COMPLIANCE WITH SOLAS AND OTHER LAWS AND SOUGHT TO INFLUENCE THE OUTCOME OF THE ARBITRATION PROCEEDINGS

33.     Pursuant to the Contract, the Vessel was to be delivered on May 1, 2008, but the delivery date was extended by mutual agreement to May 29, 2008. Irving did not attempt to deliver the Vessel until May 6, 2009, at which time it did not have any of the regulatory approvals required by the Contract or needed for its operation as a passenger vessel.

34.     Under the Contract, Pearl Seas had no obligation to accept delivery if the Vessel was not in compliance with SOLAS, the rules and regulations of the Marshall Islands, and Lloyd's Register's Rules and Regulations.  Contract § 7.4.3 provides "…[Pearl Seas] shall be under no obligation to accept the Vessel if it does not comply with the requirements of the Classification Society or other regulatory bodies."

35.     Pearl Seas gave timely notice of rejection of the Vessel on May 8, 2009, due to its physical defects, violations of SOLAS, and lack of regulatory

approvals, including Classification by Lloyd's Register and registration by the Marshall Islands.

36.     The Vessel was removed from Irving's shipyard and brought to layup at Irving's dock in Shelburne, Nova Scotia, where it remained for years.

### Fire Boundary Penetrations

37.     As discussed below, Lloyd's Register made numerous false statements and misrepresentations to all of the parties concerned with the Vessel, including Pearl Seas and the arbitration panel.

38.     From the time Irving commenced building the Vessel in April 2007, Bud Streeter, Vice President of Lloyd's Register and the Marine Manager for Lloyd's Register's marine operations in Canada at the time, was responsible for overseeing its construction.

39.     On August 28, 2009, Pearl Seas wrote to Bud Streeter to request confirmation that the Vessel's fire boundaries were intact and functioning. Pearl Seas was concerned because during sea trials, "water was observed leaking from the fourth deck down to the third deck," and was concerned that "the integrity of fire boundaries [was] a wider problem."

40.     On September 8, 2009, Streeter responded to Pearl Seas' inquiry and stated: "[f]rom visual examination of the penetrations, there is no visible evidence of leakage through the penetrations or through the structure in the area concerned."

Streeter further stated, "[w]e do not plan to retest the ship's boundaries as examination at the time of construction and subsequently, by Lloyd's Register North America and your representative, did not and have not raised concerns...."

41.    In a declaration dated September 23, 2009, which was submitted to and relied on by the arbitration panel, Streeter asserted that Irving had "built [the Vessel] in accordance with [Lloyd's Register's] technical requirements" and "the [V]essel has been completed in accordance with [Lloyd's Register's] applicable rules and regulations, and [ ] is class-worthy."

42.    In addition, Streeter stated that in "sea trials conducted in April, 2009, [Lloyd's Register's] surveyors confirmed that all class related systems complied with the applicable [Lloyd's Register's] Rules and Regulations."  Streeter then specifically stated that Lloyd's Register did not believe "the condition of the fire boundaries" required "further inspection," and, addressing Pearl Seas' concerns stated, "at this time [Lloyd's Register] knows of no condition impacting the integrity of the Vessel's fire boundaries."

43.    In a supplemental declaration dated November 16, 2009, Streeter affirmatively stated that after Pearl Seas expressed concern about the Vessel's fire boundaries, he explained to Pearl Seas that "the ship complies with SOLAS requirements."   In the Supplemental Declaration, Streeter referred to representations he made to Pearl Seas on October 20, 2009 and October 23, 2009,

respectively, at which time he falsely claimed the Vessel was SOLAS-compliant. On or about May 2, 2010, Lloyd's Register issued a letter to the Marshall Islands recommending that the equivalency for the forward stairway enclosure be granted under SOLAS. Lloyd's Register's false and misleading representations induced Pearl Seas to delay filing suit. Lloyd's Register is equitably estopped from raising limitations as defense. Lloyd's Register made false representations to, or otherwise concealed material facts from, Pearl Seas. Lloyd's Register's acts and omissions were made with knowledge of their falsity. Pearl Seas was without the professional knowledge and had no reasonably available means to ascertain whether the Vessel was SOLAS-compliant. That is because Lloyd's Register, not Pearl Seas, is a professional Classification Society tasked with ensuring that the Vessel was compliant with the rules and regulations of the professional society of which Lloyd's Register was a member. Lloyd's Register made false and misleading representations with the intention that Pearl Seas would act upon them. Pearl Seas relied on Lloyd's Register's false, misleading representations to its financial detriment. Both of Streeter's declarations were drafted by counsel for Irving.

44. Streeter's declarations were false and he knowingly misrepresented the true condition of the Vessel. In fact, the fire boundary penetrations and numerous other items did not meet SOLAS requirements.

45.     Streeter's declarations and Lloyd's Register's subsequent statement and letters became central to Irving's defense in the arbitration and in United States Court litigation.

46.     On January 6, 2010, counsel for Pearl Seas wrote to Lloyd's Register to inform it that it could be named as a party to a potential lawsuit regarding the construction of the Vessel, and request that it preserve all documents and files regarding its work on the Vessel.

47.     On March 23, 2010, John Womack, a naval architect and marine engineer hired by Pearl Seas to inspect the Vessel  stated in a declaration under oath that the "corrective action ordered by Lloyd's Register and [Irving's] attempted repair at structural fire boundary electrical wireway penetrations throughout the Vessel failed to correct deficiencies because: (1) packing sleeves, which provide several millimeter separation between cables, are not visible and therefore cannot be verified as being installed; and (2) fire caulking was not fully placed between inner cables in wireways."  Womack's statements were based on his own limited inspection of the Vessel.

48.     Womack also stated that during his inspection of the Vessel, he "identified more than 250 instances of loose and unsecured wires, which [would] present a serious shock and fire hazard when the wire coatings [were] worn away due to chafing, leaving the wires exposed."  And, Lloyd's Register permitted

"wires to continue to lay in ceiling grids, to lie on top of toilet module and stateroom ceilings, to be draped over pipes and ducts, rather than requiring them to be secured in wireways free and clear of all piping, ducting, and structure as is required by SOLAS rules." Womack's concern resulted from his discovery that "150 areas in joiner ceiling support structure and several joiner bulkhead penetrations where electrical wires [were] rubbing or pinched on sharp edges or cutouts and [were] already chafing."

49.    Womack further stated that "the scope of corrective actions ordered by Lloyd's Register [in March 2010], and the scope of issues [then] under consideration by Lloyd's Register...indicate[d] that Lloyd's Register's previous review of the Vessel was extremely deficient."

50.    Nonetheless, in oral testimony under oath during the arbitration on March 26, 2010, Streeter attested to the accuracy of his declarations, and stated, "I still believe the [V]essel's class worthy." He further stated that he believed issues raised by Pearl Seas with respect to the Vessel's non-compliance were either previously addressed, or merely "cosmetic" and not "non-compliance" issues.

51.    On May 12, 2010, Lloyd's Register issued a report of an inspection of the Vessel with Irving which Pearl Seas was not invited to attend. Following the secret inspection, Lloyd's Register certified that the "fire boundaries [were] complete (i.e. insulation intact, pens packed)."

52.     Lloyd's Register previously had indicated that five of the 31 wireway fire boundary penetrations needed to be reworked, but approved them as "re-inspected" in its May 12, 2010 inspection report, at which time it approved all fire boundary penetrations on the Vessel and represented they were in compliance with class requirements, SOLAS, and the laws and regulations of the Marshall Islands.

53.     On July 21, 2011, after a further onboard inspection of the Vessel, John Hicks of Lloyd's Register stated that the fire boundary penetrations were in compliance with all necessary regulations.  In a spreadsheet concerning a number of outstanding issues raised at a meeting on July 21, 2011 of representatives from Pearl Seas, Irving and Lloyd's Register in Halifax to discuss outstanding issues with the Vessel, Hicks wrote: "LRNA certifies that all the cable penetrations have…been surveyed and accepted."

54.     On October 17, 2011, following Hicks' next inspection of the Vessel, he again certified that the fire insulation was "in good condition[ ] and in accordance with approved plan (including openings in 'A' and 'B' class divisions, ventilation systems, windows and side scuttles and the use of combustible material)."   Hicks also stated that "[p]recautions against shock, fire and other electrical hazards" had been inspected and signed off as complete and ready for service.

55.     On October 20, 2011, however, Womack stated that only a spot check of the wire penetrations in the fire boundaries had been conducted, and "a complete and thorough inspection of the wire and pipe penetrations throughout the vessel" was never done.  Womack also noted that "none of the hundreds of wires in the stateroom overheads that are improperly strapped to other wires, piping, and ventilation ducts that [had] been noted in previous [Pearl Seas] reports were addressed" and the "wires were not properly secured in wireways as required by [Lloyd's Register's] class rules."

56.     On January 6, 2012, Womack again stated that "numerous electrical wireway penetrations through the ship's A-Class fire boundaries were never sealed or had missing caulking or packing," and "not all wireway fire boundary penetrations [had] been inspected to verify their acceptability."

57.     Womack conducted another, more extensive inspection of the Vessel on February 5, 2013, during which he opened certain overhead panels along corridors in lounge spaces to view the fire boundary penetrations.  Womack's report from the inspection established that the fire boundary penetrations still did not meet SOLAS requirements.  In particular, the penetrations were over-filled with electrical cables, did not have any and/or had a deficient number of sleeves required by the SOLAS type certificate of the RISE system, and were not caulked at all and/or were caulk-coated only on the exterior.  Overall, 30 out of 31 wireway

18

fire boundary penetrations that he inspected were deficient in both required cable sleeves and fire caulking.

58.    Contrary to Lloyd's Register's representations to Pearl Seas and the arbitration panel, numerous electrical wireway penetrations through the Vessel's A-Class fire boundaries were never sealed, and others had missing caulking or packing.  Some repairs were undertaken at the request of Pearl Seas, but not all wireway fire boundary penetrations were even inspected to verify their acceptability.

59.    Following the settlement between Irving and Pearl Seas, the Vessel was brought to Chesapeake Shipbuilding in Salisbury, MD, where work is being performed to bring the Vessel into compliance with appropriate regulatory bodies, including rebuilding the fire penetration to meet SOLAS' requirements.

## Stairway and Egress Issues

60.    Pursuant to SOLAS regulations, generally stairways must not be placed so that they are directly accessible from cabins, service lockers or other enclosed spaces containing combustibles.  This contains the risk of introducing smoke and fire into a stairway.  However, public spaces such as halls, dining rooms and lounges may have direct access to stairway enclosures so that large numbers of people might evacuate at once.

61.   On February 10, 2009, the USCG informed Lloyd's Register that several lounges on the Vessel had "been inappropriately arranged with direct access to adjacent stairway enclosures" and were still in contravention of SOLAS regulations.

62.   On August 19, 2009, Lloyd's Register responded to the USCG, stating that "Midship Lounges" are considered public spaces "which taking into consideration the size and number of persons on the ship are commensurate to the limited number of personnel and the overall vessel size and as such considered to meet the objective an[d] intent of SOLAS."

63.   On September 10, 2009, the USCG reasserted its position that, with respect to the midship lounges, the "direct accesses remain unacceptable and alternate access to these spaces must be provided."   The USCG explained that smaller lounges like the midship lounges did not hold a large number of occupants, so it did not agree with Lloyd's Register's contention that these lounges were permitted to have direct access to stairway enclosures to "balance the need to rapidly evacuate large numbers of people with the risk of introducing smoke and fire to stairway enclosures."

64.   Still, on November 3, 2009, Lloyd's Register insisted to the USCG that direct access from the midship lounges to the stairway enclosure was "considered acceptable" because, (1) "lounges are considered public spaces in

20

accordance with SOLAS," (2) "access from public space to a stairway enclosure is not prohibited," and (3) the public spaces were "separated from the stairway enclosure by A-class fire boundaries and self-closing A-class hinged fire doors in accordance with SOLAS," the "ventilation of public spaces is separate from the stairway enclosure as per SOLAS," the "public spaces are outfitted with furniture and furnishings of restricted fire risk," and the "automatic equivalent high pressure sprinkler system fitted throughout the vessel as per SOLAS…has been shown to be extremely effective…if an event occurs."

65.    On December 1, 2009, the USCG wrote to Lloyd's Register and again informed it that the placement of some of the stairways on the Vessel was "unacceptable" as they could be directly accessed from midship lounges in contravention of SOLAS regulations.

66.    On December 7, 2009, Lloyd's Register responded to the USCG's letter, stating that the placement of "furniture and furnishings of restricted fire risk…address[ ] the concerns in your letter regarding smoke protection" and requested that the USCG reconsider its determination that the placement of the stairways was not acceptable.

67.    On July 21, 2011, Hicks of Lloyd's Register stated that furniture for the Vessel was to be fitted, including the "approved fire restricting, fixed type for stairway enclosures" and indicated that no further action was needed at that point.

Hicks also noted that an exemption from the applicable SOLAS regulation for a stairwell enclosure that opens from the Vessel's office had been requested, recognizing that the positioning of this stairwell was not in compliance with SOLAS.

68.     On August 19, 2011, the USCG communicated by email that it had determined the Vessel had "significant [structural fire protection] and egress issues" that had not been addressed since the submittal of the 2009 plan.

69.     On January 13, 2012, Irving proposed solutions for resolving the access issue for the midship lounges, which included the installation of additional fire barriers and doors within the lounges. On January 20, 2012, Lloyd's Register advised Pearl Seas and Irving that it approved of Irving's proposed solutions, and on January 24, 2012, Lloyd's Register sent Irving's proposed solutions to the USCG for approval. The Lloyd's Register-approved proposal suggested that a lobby would be "fit between each referenced lounge and stairway."

70.     On March 19, 2012, the USCG advised Lloyd's Register that it was concerned with two aspects of the proposal: (1) as a result of access control considerations (locked doors), the lobbies could form unacceptable dead end corridors, and (2) as a result of the small proposed lobby sizes, an assessment team or fire party would not be able to close the stairway-lobby door, which would compromise the stairway fire/smoke boundary in trying to enter the space.

71.    On March 20, 2012, Irving submitted a further proposal in response to the USCG's concerns.

72.    On March 23, 2012, Lloyd's Register found Irving's further proposal would be acceptable if the escape routes were clearly marked with lettering and arrows, emergency lighting was in place, doors in the direction of the escape route, including the balcony door, could be opened with a single action, one of the midship lounges was larger than 28 square meters and conformed to applicable regulations, and the escape route from the other midship lounge complied with regulations.

73.    Lloyd's Register was aware that in order for the Vessel to serve its purpose as a cruise ship, it needed USCG approval and Lloyd's Register attended a meeting with the USCG at the Washington D.C. Coast Guard office to discuss the ICVE.  Yet, Lloyd's Register did not ensure that the positioning of the stairways was SOLAS-compliant.  It was the USCG that repeatedly informed Lloyd's Register that the Vessel was not in compliance with SOLAS.  As a direct result of Lloyd's Register's misrepresentations concerning the stairways, delivery of the Vessel was long delayed and caused Pearl Seas to lose the opportunity to employ the Vessel for several years and required Pearl Seas to incur the expense of rebuilding the stairways and to defend its position in the arbitration.

## Exterior Louvers and Dampers

74.     On March 23, 2010, Womack conducted an inspection of the Vessel and determined that the exterior louvers were not in compliance with SOLAS. Specifically, Womack stated, the "exterior louvers on 4th, 5th, and 6th deckhouse that [were] facing embarkation and assembly stations and open decks and stairways that are used for escape routes [were] not A-0 or A-60 class approved." Womack further stated that "the exterior louvers on 4th, 5th, and 6th deckhouse that terminate ventilation ducts penetrating the A-class exterior bulkheads [were] not fitted with manual/automatic fire dampers tested per the 'Fire Test Procedures Code.'"

75.     On August 31, 2011, Lloyd's Register approved the deck 6 louvers as being in compliance with SOLAS.

76.     On October 21, 2011, Lloyd's Register approved of Irving's plan to address the louvers on decks 4 and 5, stating that the proposal was in compliance with SOLAS.

77.     On January 6, 2012, however, following an inspection of the Vessel, Womack again stated that the exterior louvers and dampers on the 4th and 5th decks that were facing embarkation and assembly stations and open decks and stairways that are used for escape routes were "not A-0 or A-60 class approved." Womack also stated that the exterior louvers on the 4th and 5th decks that

terminated ventilation ducts penetrating the A-class exterior bulkheads did not meet applicable regulations.

78.     Pearl Seas relied on Lloyd's Register, the Vessel's classification society, to ensure that the exterior louvers and dampers, as constructed, met SOLAS requirements and other applicable rules and regulations.

79.     In fact, Lloyd's Register's representations were untrue.

## Ceiling Insulation

80.     SOLAS II-2 Reg. 9 3.2 provides: "Where "B" class divisions are penetrated for the passage of electric cables, pipes, trunks, ducts, etc., or for the fitting of ventilation terminals, lighting fixtures and similar devices, arrangements shall be made to ensure that the fire resistance is not impaired...."

81.     In order for the Vessel to be in compliance with applicable regulations, Irving was to develop drawings showing how the ceiling would be constructed, including: (1) approvals showing the proposed arrangement has been fire tested and approved as a B-15 ceiling, (2) details of the insulation installation (joints, fixing in place against movement, hanger integrity for added weight, etc.) and (3) details of all penetrations such as speakers, light fixtures, ventilation ducts, and sprinkler heads to show how they will meet the B-15 fire standards. Additionally, the use of B-15 insulation is acceptable only if Lloyd's Register, the Marshall Islands and the USCG agree the insulation itself and the installation of

25

the insulation meet all applicable SOLAS requirements. As the Vessel's classification society, Lloyd's Register was responsible for ensuring that Irving built the Vessel in compliance with SOLAS requirements.

82. On October 20, 2011, John Womack noted that to be in compliance with SOLAS, the ceiling of the Vessel must have a minimum fire rating of B-15. At that time, Womack stated that the B-15 ceilings in stateroom overheads were still not in compliance with SOLAS or the rules and regulations of the Marshall Islands, and were not addressed in Lloyd's Register's September 1, 2011 survey of the Vessel.

83. On January 20, 2012, John Hicks of Lloyd's Register stated, that "the addition of B15 insulation in way of the cabin/toilet module ceilings is considered to meet the requirements of the USCG." Hicks' statement, however, was untrue. The addition of insulation is a SOLAS requirement, not a USCG requirement. Further, the use of B15 insulation is acceptable only if Lloyd's Register, the Marshall Islands and the USCG agree that the insulation itself and the installation of the insulation all meet applicable SOLAS requirements.

84. On January 24, 2012, Lloyd's Register informed the USCG that it would bring the cabin/corridor ceiling arrangements into compliance with SOLAS regulations by fitting them with additional insulation to achieve a B-15 rate of rise classification.

85.     On January 26, 2012, Womack again stated that the arrangement of the structural fire protection bulkheads and ceilings forming the passenger stateroom to corridor boundary did not comply with SOLAS regulations.

86.     But, on December 17, 2012, the arbitration panel recognized that the overhead insulation of the Vessel was still not in compliance with B-15 insulation requirements.  The panel directed Irving to complete all work necessary to get the Vessel accepted and classed by all relevant regulatory bodies as quickly as possible, and directed Pearl Seas to place $690,000, the cost of repairs to the overhead insulation, in escrow.

87.     Lloyd's Register's false misrepresentations that the ceiling insulation was in compliance with SOLAS regulations caused Pearl Seas to make expenditures above and beyond any payments it anticipated making in connection with the construction of the Vessel; required Pearl Seas to defend its position in the arbitration at considerable cost and expense; and caused Pearl Seas to lose the opportunity to employ the Vessel for several years.

**Lloyd's Register Acted Intentionally**

88.     Lloyd's Register has had a long relationship with Irving.  The relationship between them was such that Irving was able to exert great economic pressure on Lloyd's Register.

89.     Irving obtained a contract with the Canadian government to construct a large number of ships.  Lloyd's Register hoped to obtain a contract with Irving to class and inspect each of these ships.

90.     Streeter advised Pearl Seas that Steve Durrell, the former President of Irving, told Lloyd's Register that if they did not "play ball" and do all that they could to get Pearl Seas to accept delivery of the Vessel, Irving would no longer give them business.  Irving had lost millions of dollars in constructing the Vessel and became increasingly anxious for Pearl Seas to accept the non-compliant Vessel without incurring even greater expenses and losses.

91.     To assist Irving as fully as possible, Lloyd's Register acted willfully and with the intent and purpose of convincing the arbitration panel and Pearl Seas that the Vessel was in compliance with SOLAS, its own Rules, and the laws and regulations of the Marshall Islands even though that was not the case.

92.     Lloyd's Register's intention was to induce Pearl Seas to accept delivery of the Vessel and to influence the outcome of the arbitration proceeding to Pearl Seas' financial detriment.  Lloyd's Register agreed to assist Irving in trying to persuade Pearl Seas to accept the Vessel and repeatedly stated to Pearl Seas and to the Arbitration Panel that the Vessel was classworthy, SOLAS-compliant, and was in compliance with the Contract even though it knew or should have known that was not so.

28

93.     Additionally, because Lloyd's Register had approved the plans for the Vessel, it would have been inconsistent for it to admit that certain aspects of the plan rendered the Vessel *not* regulatory-compliant.

## PEARL SEAS INCURRED DAMAGES AS A RESULT OF LLOYD'S REGISTER'S FAILURE TO PROPERLY REPORT THE ACTUAL CONDITION OF THE VESSEL UPON DELIVERY

94.     In sum, the areas of the Vessel that *still* were not in compliance with Lloyd's Register's Regulations or SOLAS when it was delivered to Pearl Seas, despite Lloyd's Register's statements to the contrary, include, but are not limited to, Amidship and Forward Stairway Run-Rise & Tread Dimensions; Amidship and Forward Stairway Landing Widths; Corridor B-Class Fire Bulkheads and Continuous Ceilings Boundaries; Combustible Insulation on HVAC Hot Water Pipes; Combustible Insulation on HVAC Ducting; Fire Door Threshold escape routes; Electrical Cable Chafing on Sharp Edges in Penetrations or Joiner/Ceiling Support Structures; Loose and Unsecured Electrical Wires in the Stateroom Ceilings; Loose and Unsecured Electrical Wires in Toilet Module Ceilings; Electrical Wires Improperly Secured to Piping, Ventilation Ducts, and/or Joiner/Ceiling Support Structures; Electrical Wire Chafing in Joiner Bulkhead Penetrations; Toilet Module GFI Receptacles Missing Junction Box; Electrical Wireway Structural Fire Boundary Penetrations; Damaged Electrical Cables; B-15 Class Fire Ceiling Lighting Fixture Penetrations; B-Class Fire Outlet & Switch

29

Box Penetrations; Forward Stairway Center Handrail Newel Post Location; Amidship and Forward Stairway Center Handrail Continuity; Exterior Deck Handrail Cap Mounting Screws; Main Engine & Genset Seawater Hose Connections; Accommodation B-Class Fire Bulkhead T-Joints; Main Engine and Genset Individual Fuel Return Line Shutoffs; Main Engine Genset Fuel Return Line Flanges Over Engines; Main Propulsion Gearbox Mounting Bolts Have Hexagonal Head Flats Cut Off; Critical Systems Equipment Accessibility; Machinery Space Non-Skid Deck Surfaces; Oil-Tight Drip Pans Under Ship's Fuel Oil System; High-Fog Fire Suppression System Section Stop-Valves; and Exterior Ventilation Louvers and Dampers.

95.     Pearl Seas has incurred over $20 million in losses because it relied on Lloyd's Register's statements that the Vessel was in compliance with regulations when delivered.  Pearl Seas was forced to pay (1) the cost of extensive repairs to ensure compliance with SOLAS, (2) legal fees in connection with a prolonged arbitration, during which the arbitration panel also relied on the misstatements, and false and fraudulent representations of Lloyd's Register, (3) arbitrators' fees, and (4) the cost of having a second Classification society review the plan for the Vessel and approve its class certifications.  Pearl Seas also suffered a loss of revenue and profits it would have earned from the use of the Vessel.  Pearl Seas has sustained

damages arising from an injury or loss caused by an error in Lloyd's Register survey/classification of the Vessel.

## AS AND FOR A FIRST CAUSE OF ACTION
### (FRAUD)

96.    Pearl Seas repeats and re-alleges each and every allegation hereinabove set forth, with the same force and effect as if herein repeated and set forth at length.

97.    Lloyd's Register falsely represented to Pearl Seas that the Vessel was in compliance with its Rules and Regulations, SOLAS and the laws and regulations of the Marshall Islands.

98.    Lloyd's Register knowingly made these false representations to Pearl Seas and the arbitration panel with the intent of wrongfully inducing Pearl Seas to accept delivery of the Vessel, and of influencing the outcome of the arbitration proceeding to Pearl Seas' detriment.

99.    Pearl Seas justifiably relied on Lloyd's Register's false representations, as did the arbitration panel.

100.   Pearl Seas was severely injured and suffered damages by its reliance on Lloyd's Register's false representations.

31

## AS AND FOR A SECOND CAUSE OF ACTION
## (GROSS NEGLIGENCE)

101.  Pearl Seas repeats and re-alleges each and every allegation hereinabove set forth, with the same force and effect as if herein repeated and set forth at length.

102.  Lloyd's Register knew of, but disregarded, an unjustifiably high risk of harm to the health and safety of Vessel passengers as well as liability to Pearl Seas as a result of any injury to passengers of the Vessel, by issuing reports indicating the Vessel met SOLAS and class requirements, and such risk was obvious and was known to Lloyd's Register.

103.  Pearl Seas was directly damaged as a result of Lloyd's Register's grossly negligent conduct.

## AS AND FOR A THIRD CAUSE OF ACTION
## (NEGLIGENT MISREPRESENTATION)

104.  Pearl Seas repeats and re-alleges each and every allegation hereinabove set forth, with the same force and effect as if herein repeated and set forth at length.

105.  As a classification society, Lloyd's Register had a duty to give Pearl Seas complete and accurate information as to whether the Vessel complied with SOLAS, flag State and class requirements.

106.   Lloyd's Register made false representations regarding the Vessel's compliance with SOLAS, flag State and class requirements, and failed to exercise reasonable care in gathering the necessary information.

107.   Pearl Seas was a member of a limited group for whose benefit and guidance Lloyd's Register was to supply its information, and Lloyd's Register knew that Pearl Seas as a member of that select group would receive the inaccurate information.

108.   Pearl Seas intended to, and did in fact, reasonably and justifiably rely on Lloyd's Register's false representations and was thereby injured in the amount of over $20 million.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (COLLUSION, AIDING AND ABETTING, FRAUD AND CIVIL CONSPIRACY)

109.   Pearl Seas repeats and re-alleges each and every allegation hereinabove set forth, with the same force and effect as if herein repeated and set forth at length.

110.   Lloyd's Register colluded and conspired with Irving to unfairly and improperly influence the outcome of the arbitration proceeding to the detriment of Pearl Seas.  Lloyd's Register had knowledge that what it was doing was wrong; had the intent to assist Irving in committing the wrong; gave Irving assistance or

encouragement; and it's assistance or encouragement was a substantial factor in bringing about the wrong.

111.   Lloyd's Register was a member of a combination or two or more entities.   The object of the combination was to accomplish an unlawful purpose. Lloyd's Register and Irving had a meeting of the minds on the object or course of action.   Lloyd's Register committed an unlawful overt act to further the object or course of action.   Pearl Seas suffered injury and damages as a proximate result of the wrongful act.

112.   Because of the nature of the tort and the relationship between Lloyd's Register and Irving, any and all acts or omissions of one are attributable to the other, such that Lloyd's Register is vicariously liable for the tortious conduct of Irving and for which Pearl Seas may recover damages from Lloyd's Register.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (PROMISSORY ESTOPPEL IN TORT)

113.   Pearl Seas repeats and re-alleges each and every allegation hereinabove set forth, with the same force and effect as if herein repeated and set forth at length.

114.   Lloyd's Register made promises to Pearl Seas which the latter reasonably and substantially relied on to its detriment.   It was foreseeable to Lloyd's Register that Pearl Seas would rely on its promises.   Injustice can be avoided only by enforcing Lloyd's Register's promises.

115. On September 23, 2009, Lloyd's Register, through its vice president, attested in a declaration that the shipyard had built the Vessel in accordance with Lloyd's Register's technical requirements; Lloyd's Register was prepared to issue a class certificate for the Vessel; and Lloyd's Register's surveyors continuously surveyed and inspected the Vessel throughout the course of construction, that Lloyd's Register's surveyors confirmed in April 2009 that all class-related systems complied with applicable Lloyd's Register Rules and Regulations and SOLAS, that the Vessel has been completed in accordance with Lloyd's Register's applicable Rules and Regulations and SOLAS, and the Vessel was class-worthy.

116. On October 15, 2009, Lloyd's Register, through its vice president, promised Pearl Seas that Lloyd's Register "absolutely" intended to follow up at a later date with the fire boundary concerns.

117. On October 20, 2009, Lloyd's Register, through its vice president, emailed Pearl Seas and promised that Lloyd's Register "intend[s] to document the [fire safety] concerns you raise and we will address them as necessary at the time of final surveys when delivery to the owner is agreed by the builder."

118. Lloyd's Register, through its vice president, emailed Pearl Seas on October 23, 2009 and represented that "this construction methodology complies with the SOLAS requirements."

35

119.   On November 16, 2009, Lloyd's Register, through its vice president, asserted that the Vessel "continues, in LR's view, to be class-worthy."

120.   To this day, the Vessel has yet to obtain its class certificates, and has been delayed in entering service for more than four years from the original tender of delivery by the shipyard in the spring of 2009.

121.   Pearl Seas incurred damages in the amount of more than $20 million as a result of Lloyd's Register's promissory breaches.   Pearl Seas' damages include, among others, substantial costs to bring the Vessel into compliance, with classification society and flag state requirements, significant delay costs, legal and arbitration fees and expenses, loss of use, lost profits and lost revenue.

## (PUNITIVE DAMAGES)

122.   Pearl Seas repeats and re-alleges each and every allegation hereinabove set forth, with the same force and effect as if herein repeated and set forth at length.

123.   Lloyd's Register's conduct towards Pearl Seas and the general public was gross, wanton, willful, malicious and in reckless disregard of the truth. Lloyd's Register's conduct was of such wanton dishonesty and high moral turpitude as to imply a criminal indifference to civil obligations owed by Lloyd's Register to Pearl Seas. The acts or omissions, when viewed objectively from Lloyd's Register's standpoint at the time they occurred, involved an extreme

degree of risk, considering the probability and magnitude of the potential harm to Pearl Seas. Lloyd's Register had actual, subjective awareness of the risk but proceeded with conscious indifference to the rights, safety, or welfare of Pearl Seas. Lloyd's Register's acts and omissions amount to gross negligence under governing law.

124. Pearl Seas is, therefore, entitled to punitive damages under the governing law in an amount to be determined at trial.

WHEREFORE, Pearl Seas prays:

a. That judgment may be entered in favor of Pearl Seas against Defendant Lloyd's Register in an amount to be determined at trial, together with interest, costs, litigation expenses and attorneys' fees;

b. That the Court award Pearl Seas its costs, legal fees and other expenses to which it otherwise might be entitled; and

c. For such other and further relief as this Court may deem just and proper, including, but not limited to, punitive damages.

Respectfully submitted,


Keith B. Letourneau
State Bar No. 00795893
Federal Bar No. 20041
700 Louisiana, Suite 4000
Houston, Texas 77002
Telephone: (713) 228-6601
Facsimile: (713) 228-6605
Email: kletourneau@blankrome.com

*Attorneys for Plaintiffs PEARL SEAS CRUISES LLC*

**OF COUNSEL:**
Wm. Tracy Freeman
State Bar No. 00793757
Federal Bar No. 19588
Email: wfreeman@blankrome.com
**BLANK ROME LLP**

John D. Kimball
Lauren B. Wilgus
Rebecca L. Avrutin
The Chrysler Building
405 Lexington Avenue
New York, NY  10174-0208
(212) 885-5000
**BLANK ROME LLP**